1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9  TERRENCE ROWLAND, SR.,                    CASE NO. 1:10-cv-00917-SMS

10                        Plaintiff,

                                             ORDER REVERSING AGENCY'S
11          v.                               DENIAL OF BENEFITS AND REMANDING
                                             FOR FURTHER PROCEEDINGS
12  MICHAEL ASTRUE,
    Commissioner of Social Security,
13
                          Defendant.
14  _____/

15
16          Plaintiff Terrence Rowland, Sr., by his attorney, Law Offices of Lawrence D. Rohlfing,

17  seeks judicial review of a final decision of the Commissioner of Social Security

18  ("Commissioner") denying his application for supplemental security income pursuant to Title

    XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) (the "Act").  The matter is currently
19
    before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the
20
    Honorable Sandra M. Snyder, United States Magistrate Judge.  Following a review of the
21
    complete record and applicable law, this Court finds that the decision of the Administrative Law
22
    Judge ("ALJ") is insufficiently detailed to permit judicial review.  Accordingly, this Court
23
    remands this matter for further proceedings consistent with this decision.
24
## I.      Administrative Record
25
### A.      Procedural Record
26
            On August 2, 2005, Plaintiff filed an application under Title XVI for supplemental
27
    security income, alleging disability beginning January 1, 2003. The claim was initially denied on
28

1

March 10, 2006, and upon reconsideration on June 6, 2006.  Plaintiff requested a hearing on July 17, 2006.

Plaintiff appeared and testified at a hearing on July 10, 2007.  In a decision dated August 31, 2007, Administrative Law Judge Christopher Larsen ("ALJ") denied Plaintiff's application. The Appeals Council affirmed the ALJ's decision on March 30, 2010.  On May 20, 2010, Plaintiff filed his complaint in this Court.

## B.   Factual Record

On September 17, 2002, Plaintiff (born March 9, 1959) experienced an interventricular hemorrhage while living in Tennessee.  Plaintiff explained that he stopped working after his "stroke" because his doctor told him that he was unable to work.

Thereafter, Plaintiff moved to Dinuba, California, to live with his mother, Sandra Nicol-Monroy.   His niece, Sophia Zuniga, then age 21, also lived in the home.  Nicol-Monroy had raised Zuniga, who was developmentally delayed and worked part-time as a child care worker. One or both of Plaintiff's two adult sons from his former marriage also lived with Plaintiff and Nicol-Monroy from time to time.

Plaintiff did not work after he returned home to California.  Immediately prior to his hemorrhage, Plaintiff had worked as the houseman in a historic hotel in Chattanooga, Tennessee, where he had been employed since 2000.  Plaintiff testified that, in this position, he supervised the maids, delivered supplies to them, and removed trash to bins.  Six hours of his work day was spent walking or standing; he never lifted more than ten pounds.  In his written work history report to the agency, Plaintiff indicated that he picked up linen, took out trash, delivered supplies to guest rooms, entered rooms that were completed into computer records, and supervised the maids.  He walked for three hours; stood for three hours; sat, climbed, and stooped for one-half hour each; and wrote, typed, or handled small objects for one-half hour.  He never lifted more than ten pounds.

In or about 1999, Plaintiff briefly worked as an industrial cleaner for Odwalla Juice.  He testified that he sanitized the floors by spraying a chemical using a hose and was not required to do any lifting.  According to the written work history, Plaintiff cleaned and sanitized juice

machines and the floors, lifting and carrying the mops, "squeezer," and hoses for hot water buckets.  He walked three hours; stood three hours; handled, grasped, or grabbed large objects one hour; and climbed or stooped for one-half hour each.  The heaviest weight he lifted was twenty pounds, and he frequently lifted twenty-five pounds [*sic*].

Plaintiff was unemployed from 1992 through 1998.  Plaintiff had previously worked as a gate security guard and served in the U.S. Army for three years, primarily working as a military policeman.  Although Plaintiff completed an associate degree in business (computers) in 1979, he was never employed in that field.

**Erlanger Health System.**  Plaintiff was hospitalized from September 17 to 24, 2002, following a spontaneous interventricular hemorrhage, possible caused by poorly controlled hypertension or an underlying lesion.  His discharge diagnoses were (1) interventricular hemorrhage; (2) malignant hypertension; (3) obesity; (4) tobacco (snuff) use disorder; (5) heart rhythm disorder; and (6) depressive disorder.  Following discharge, Plaintiff was directed to resume his regular activities as tolerated and to eat a low sodium cardiac diet.

**Veterans' Administration.**  Beginning in November 2002, Plaintiff received medical care from the California Health Care Center of the Veteran's Administration ("CHCC").  CHCC provided various services to Plaintiff, including diabetes education, counseling, and prescription services.

**Dr. Malakkla (CHCC).**  Nagabh Malakkla, M.D., was Plaintiff's initial physician at CHCC.  He diagnosed Plaintiff's infection with Heliobacter pylori, esophageal reflux, essential hypertension, and cerebral artery occlusion with cerebral infarction.  In 2004, Plaintiff sent CHCC a letter requesting CHCC to assign Plaintiff a different primary care physician.[1]

**Dr. Kator (CHCC).**  Beginning in July 2004, Stephen F. Kator, M.D., treated Plaintiff's physical ailments.  His diagnoses of Plaintiff included diabetes mellitus, hypothyroidism, asthma, peripheral neuropathy, impetigo, shoulder joint pain, bad breath, headaches, late effects of

---

[1]  Although Plaintiff's letter was reportedly scanned into his CHCC medical records, it is not included within the agency record.  Plaintiff complained to consulting psychologist Peggy Jackson-Salcedo, Ph.D., that Malakkla told Plaintiff that he was going back to work "even if he had a triple by-pass."  Jackson-Salcedo interpreted Plaintiff's remark as indicating that Plaintiff though Malakkla was "insensitive."  AR 204.

cerebrovascular disease, obesity, dyslipedemia, refractive errors, and hyperglycemia.  Kator

referred Plaintiff for an examination of his vision, noting the Plaintiff was experiencing painless

progressive loss of vision and associated muscle tension headaches.

**Mental Health Clinic (CHCC).**  Psychiatric nurse Paula Hensley, R.N., prepared an

initial intake report for the CHCC mental health clinic on February 24, 2004.  Plaintiff's

presenting complaint was depression.  His history included depression with suicidal and

homicidal intent.  Describing persistent thoughts of harming himself, Plaintiff disclosed that he

had given his mother his gun and knife because he did not trust himself, although he had no

suicide plan.

Hensley described Plaintiff as moderately impaired in his ability to care for himself.  He

was disheveled and carelessly dressed.  He demonstrated satisfactory attention and concentration

and variable distractibility.

**Dr. Howasepian (CHCC).**  Clinical psychiatrist Avak Howasepian, M.D., diagnosed

learning disability, alcohol abuse in remission, and depressive disorder.  He oversaw Plaintiff's

treatment with medication and individual psychotherapy.  Because of the distance between

Plaintiff's home and CHCC, Plaintiff did not participate in group therapy.

At a May 6, 2004 appointment, Plaintiff told Howasepian that his SSI application had

been denied because he had too much education.  Plaintiff expressed concern that, if his mother

lost her house, he would have to live on the street or commit suicide.  Although Plaintiff

reassured Howasepian that he had no plans to commit suicide in the short term, Plaintiff had

considered various ways to kill himself, including shooting, hanging, or poisoning himself.  At a

follow-up appointment on June 9, 2004, Plaintiff again stated that he had no plans to commit

suicide, but would not contract for his own safety in the long run. Howasepian discussed with

Plaintiff how his continued alcohol abuse affected his emotional and cognitive functioning,

worked against his antidepressant, and worsened his depression.

On June 21, 2004, Howasepian noted:

Has, in the past few months, told one care provider (Dr. Battista) that he drinks a
case of beer every week, then told me that he drinks 18 beers every two weeks,

then 8 beers a week.  In light of the arrangement made with son regarding accepting phone calls, is not above prevarication.

AR 381.

On April 18, 2005,   Howasepian noted that Plaintiff again reported that he had stopped drinking alcohol.[2]

**Dr. Battista.**  On April 16, 2004, clinical neuropsychologist Matthew Battista, Ph.D., conducted a neuropsychological evaluation at Dr. Kator's request.  Plaintiff told Battista that his primary concern was his memory functioning, which Plaintiff described as weak but not disordered.  Plaintiff reported chronic vomiting and headaches.

Battista observed that Plaintiff appeared older than his age.  He was obese and malodorous.  His clothes were torn and dirty.

Plaintiff's gait, alertness, and eye contact were within normal limits.  Although his speech was slow and monotonic, Plaintiff did not display any difficulties with word finding or auditory comprehension.  He was despondent about his situation.  Although Plaintiff was cooperative and conversant, Battista had difficulty assessing Plaintiff's insight and judgment.

Plaintiff reported social isolation although he maintained a daily internet relationship with a woman in Indiana.  He had few interests other than cooking for his family.  In a typical day, Plaintiff fed and watered his dogs, cared for his plants, and cooked lunch and dinner for his family.  He enjoyed spending time with his family and watching the news with his mother.

Plaintiff reported that he drank alcohol and used drugs for many years after returning from the army.  Although he claimed to no longer used drugs, Plaintiff told Battista that he drank about a case of beer a week.

///

---

[2]  The record includes numerous other notes of Plaintiff's reporting consumption of widely varying amounts of alcohol, including a report to a CHCC nurse that he was drinking a case of beer a day prior to his hemorrhage; a report to another nurse that he drank seven beers on Father's Day; a report that he kept no alcohol at home; a report that he drank one or two beers two to four times a month; and a report that he never drank more than six beers at a time.
    Plaintiff was prescribed ibuprofen for pain.  Several notes in his medical records report his requesting prescription pain killers that would be stronger.  The CHCC pharmacist screened Plaintiff's prescriptions for their addictive potential.

Battista administered a battery of tests.  On the NCSE, an omnibus measure of cognitive functioning, Plaintiff's scores were all within the normal range except for arithmetic calculation. Plaintiff's memory, orientation, attention, and reasoning abilities were all within the normal range.  Plaintiff's scores were approximately the same on the MMSE, a test of cognitive functioning.  Results of the WAIS-III revealed that Plaintiff's intellectual functioning was within the average range, but the discrepancy between his verbal IQ (106) and his performance (nonverbal) IQ (83) was significant.  The test revealed specific weaknesses in perceptual organization, processing speed, arithmetic, digit-symbol coding, matrix reasoning, and picture completion.  On the WRAT, Plaintiff's reading skills were within normal limits, but his arithmetic and spelling scores were lower than would be expected.  Finally, on the MCMI-III, a personality inventory, elevated scores suggested schizoid tendencies, avoidant symptoms, and depressive symptoms.

Battista opined that Plaintiff's alcohol abuse and dependence undermined the reliability of Plaintiff's test results.  He recommended that alcohol cessation and treatment of depression be priorities in Plaintiff's care.  He diagnosed:

| | |
|---|---|
| Axis I | Dysthymic Disorder<br>Alcohol Dependence<br>Learning Disorder NOS |
| Axis II | Schizoid and avoidant traits |
| Axis III | HTN, Hepatitis C |
| Axis IV | unemployed, divorced, resides with mother and his son [in] mother's home |
| Axis V | GAF = 55 |

AR 323-324.[3]

---

[3]  The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations." *Id.* at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  *Id.* at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  *Id.* at 33.

GAF 55 is in the middle of of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack) OR moderate difficulty in social, occupational, or school

**Daily activities questionnaire (2002).**  In a daily activities questionnaire completed December 6, 2002, Plaintiff reported that he could dress, bath, and cook for himself.  He kept his own room clean.  He tired easily and needed to pace himself and to rest as needed.  He napped for an hour after lunch and retired at 9:00 p.m.

The heaviest object he lifted was a laundry basket, which he estimated weighted fifty pounds.  Plaintiff shopped once weekly with his niece's help.  His memory was poor, and he required help keeping track of his medications.

**Residual functional capacity (2003).**  On February 21, 2003, Alfred Torre, M.D. completed a residual functional capacity analysis on behalf of the agency.  He opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently; sit, stand or walk for six hours in an eight-hour work day; and had unlimited ability to push and pull.

**Psychological evaluation (2003).**  On March 27, 2003, psychologist Peggy Jackson-Salcedo, Ph.D., conducted a psychological evaluation on behalf of the agency.  Plaintiff reported that his current symptoms included sleeping difficulties, headaches, fatigue, lack of energy, poor memory, heart palpitations, dizziness, and fainting spells.  He denied alcohol use.  Plaintiff reported that he was able to cook, do his own laundry, and manage his own checking account and finances.  Because of his poor memory, however, he needed to make shopping lists and sometimes burned things when he cooked.

Jackson-Salcedo administered various psychological tests.  On the Wechsler Adult Intelligence Scale III, Plaintiff scored 97, verbal; 76, performance; and 87, full scale.  Plaintiff's scores on the various subtests showed similar disparities.  Jackson-Salcedo opined that the disparity in Plaintiff's scores could reflect a neurological disorder (brain damage), emotional or psychiatric disorder, or normal aging.  Accordingly, she recommended that these scores be used with caution.

On the Wechsler Memory Scale III, Plaintiff generally scored within the normal range, although his "working memory" was low average.  On the Wide Range Achievement test,

functioning (e.g., few friends, conflicts with peers or co-workers." *Id.* at 34.

Revision 3, Plaintiff read at the high school level; spelled at the fifth grade level, and did arithmetic at the sixth grade level.  On the Bender Visual Motor Gestalt Test, Plaintiff scored within the normal range.

In the course of the examination, Jackson-Salcedo observed that Plaintiff was pleasant and cooperative with satisfactory attention, concentration, and distractability.  He had dirty hands and nails, and wore messy and smelly clothing.  His hair, beard, and moustache were messy, uncombed and required trimming. His bad breath was unpleasant.  Jackson-Salcedo did not observe any motor or gait difficulties, or perceptual disturbances.  Plaintiff's judgment and insight were intact, and he was well oriented.

Jackson-Salcedo diagnosed Plaintiff as having a depressive disorder.  She opined that Plaintiff could understand, remember, and carry out instructions based on his intellectual capacity.  His lowered performance scores could mean, however, that he would exhibit slower response times, initiative, and follow through.  Plaintiff had low-average attention, concentration, and pace, with particular difficulties in spatial reasoning and visual-motor coordination.  His memory ability was average but would be enhanced if materials were presented to him in visual form.  Plaintiff could be expected to be pleasant, cooperative, and to make good effort on the job.

**Mental residual functional capacity (2003).**  On May 5, 2003, Evelyn Aquino-Caro, M.D., a staff physician for the agency, prepared the psychiatric review technique, diagnosing Plaintiff as having both organic mental disorders and affective disorders. Neither disorder fit any of the specific categories set forth on the assessment form.  She opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.

Aquino-Caro also prepared a mental residual functional capacity assessment.  She opined that Plaintiff had no significant limitations except for moderate limitations in his ability to understand and remember detailed instructions and in his ability to carry out detailed instructions.

**SSI application (2005).**  In his August 2, 2005 SSI application, Plaintiff stated that his ability to work was limited after his hemorrhage since light caused headaches and his

medications slowed him down.  Since his 2002 application for benefits, Plaintiff had developed

diabetes mellitus and associated peripheral neuropathy.   Pain in his feet precluded his going

outside if the weather was too hot or too cold.

**Daily activities questionnaire (2005).**   In a daily activities questionnaire completed

September 14, 2005, Plaintiff reported that any effort made him feel so sick that he returned to

bed.  Even walking fifteen yards to the mailbox left him exhausted, with burning feet.  He could

lift little more than the garden hose or a small glass of milk.  He no longer shopped.  He needed

to rest six to eight times a day, and could not sleep at night.

**Dr. Kator (CCHC).**  On August 1, 2005, Kator completed a questionnaire for Tulare

County Child Support Services, describing Plaintiff's hemorrhage as having left him with

chronic pain, ataxia, cognitive deficits, and heat intolerance.  In response to the question of when

Plaintiff could return to work, Kator wrote, "permanently disabled."[4]

On August 2, 2005, Kator observed that Plaintiff displayed mild stuttering and word-

finding problems and walked with an ataxic gait.[5]  He noted that Plaintiff had "dysmetabolic

syndrome," a precursor to diabetes.[6]  Kator stated, "It is important you lose weight in any way

possible."  On March 15, 2006, Kator noted that Plaintiff ate heavily in the evening and did not

exercise.

On March 15, 2006, Plaintiff received a TENS unit for use in relieving his shoulder pain.

On July 7, 2006, Kator noted that gabapentin was effectively relieving Plaintiff's pain,

allowing him to do things that he had not been able to do before.  Plaintiff reported that dietary

modification had not helped him lose weight and requested a diet pill.

---

[4]  The questionnaire was required as part of Plaintiff's effort to regain his California driver's license, which had been revoked for his failure to pay child support to his ex-wife for the couple's two children.

[5]  Ataxia is a "failure of muscle coordination; irregularity of muscle action."  *Dorland's Illustrated Medical Dictionary* (28th ed.) at 153 (W.H. Saunders Co. 1994).

[6]  A patient has metabolic syndrome (also called dysmetabolic syndrome or insulin resistance) if he or she has three or more of the following symptoms: a large waistline, a high triglyceride level, a low HDL cholesterol level, high blood pressure, and high fasting blood sugar.  www.hhlbi.nih.gov/health/dci/Disease/md/ms_whatis.html (August 15, 2011).  Compared to people without metabolic syndrome, an individual with metabolic syndrome has twice the risk of developing heart disease and five times the risk of developing diabetes.  *Id.*

1    On July 11, 2006, Plaintiff received a wheeled walker.

2    On August 31, 2006, Plaintiff complained of intermittent upper abdominal pain and

3    constipation.  He admitted to Kator that he did not follow his diet.  Plaintiff reported that he had

4    eaten six hot dogs with buns the day before.

5    A January 1, 2007 podiatric consultation determined that Plaintiff was unable to feel any

6    of the monofilament touches to his feet.

7    **Dr. Howasepian (CCHC).**  On August 28, 2006, Plaintiff, who had recently experienced

8    blood in his stool, told Howasepian that he feared that he had cancer and would die before his

9    mother.  Accordingly, Plaintiff, who reported that he had been eating a gallon of mayonnaise a

10    month, had decided to stop eating mayonnaise and bread.  Plaintiff told Howasepian that he had

11    not consumed alcohol in a year.

12    On October 18, 2007, Plaintiff reported that Zuniga had moved out several months ago

13    and was living with his sister.  Plaintiff feared that his mother, who had fallen recently and

14    injured herself, would die and leave him homeless, with no one to drive him to medical

15    appointments.  Plaintiff expressed anger at Dr. Tan, who told Plaintiff during his hospitalization

16    that his desire to harm his niece related to his desire to harm himself.

17    **Internal medicine consultation (2005).**  Agency consultant James A. Nowlan, Jr., M.D.,

18    provided an internal medicine evaluation on November 5, 2005.  Plaintiff's chief complaints

19    were memory loss, pain in his left shoulder, burning feet and hands, and loss of smell and taste.

20    Plaintiff disclaimed any memory of his hemorrhage and the ensuing hospitalization, although he

21    needed to use a walker thereafter.  He attributed his shoulder pain and burning hands and feet to

22    the hemorrhage.  Medication did not relieve his symptoms.

23    Nowlan commented, "He seems somewhat confused and he took a while to answer each

24    question because he had to think about it."  AR 240.  Nowlan was unable to detect any

25    abnormalities of Plaintiff's cranial nerves.  He observed that Plaintiff was obese.

26    Nowlan considered Plaintiff's major impairment to be memory loss, although special

27    testing would be required to determine its degree. He could identify no limitation relating to

28    Plaintiff's claim of shoulder pain.  Nowlan opined that Plaintiff could stand and walk for six

hours in an eight-hour day; could sit without limitation; could lift ten pounds frequently and forty pounds occasionally; had slight postural limitations; and had no manipulative limitations. Plaintiff required no assistive devices.

**Mental residual functional capacity (2006).**  On March 8, 2006, E. A. Murillo completed the psychiatric review technique, diagnosing Plaintiff with affective disorders.  She opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  Plaintiff had no significant limitations except for moderate limitations in his ability to understand, remember, and carry out detailed instructions.

Murillo also prepared a mental residual functional capacity assessment.  Murillo opined that Plaintiff could perform simple and repetitive tasks with adequate pace and persistence, and could adapt and relate to co-workers.

**Psychiatric hospitalization.**  Plaintiff was hospitalized from May 7 to May 14, 2007, initially pursuant to California Welfare and Institutions Code § 5150, then voluntarily, after he made homicidal threats against Zuniga.  His admission diagnosis was:

Axis I         Homicidal threats

Axis II        Personality disorder

Axis III       See [personal medical history]

Axis IV        Chronic care of invalid mother

Axis V         GAF 35

AR 578.[7]

Shortly after admission, the diagnosed was changed:

Axis I         1.    Dysthymic disorder.
               2.    Alcohol dependence.
               3.    Learning disorder.

---

[7]  GAF 35 is in the middle of the range GAF 31-40, which indicates "Some impairment in reality testing or communication (e.g., speech is sometimes illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  DSM IV TR at 34.

| Axis II | Schizoid and avoidant traits. |
|---|---|

| Axis III | 1. | Hypertension. |
|---|---|---|
| | 2. | Hepatitis C. |

Axis IV    Financial and social stressors, alcohol abuse and personality disorder.

Axis V    GAF = 47

AR 641.[8]

Plaintiff made the threats during a session with Howasepian, with whom he shared a list of 43 ways to kill Zuniga: Plaintiff intended to list 102 ways of killing her before carrying out his plan. Plaintiff disclosed that he had been thinking about killing Zuniga for the past year, contending that she was "filthy, lazy, and unwilling to help care for his mother." AR 642. He asserted that Zuniga was rude to his mother and ran the house as if it were her own. AR 642. Plaintiff told Howasepian that he was 99 percent of the way to carrying out his homicidal plans.

Plaintiff also gave Howasepian three floppy discs containing his journal entries, which consisted of "loose and angry [or] violent statements against the VA, the State, social workers, having a diagnosis of hepatitis C and being denied disability." AR 642.

At discharge, Plaintiff's diagnosis was:

| Axis I | 1. | Dysthymic disorder by history currently improving. |
|---|---|---|
| | 2. | Alcohol dependence. |
| | 3. | Learning disorder NOS, rule out cognitive. |

| Axis II | Deferred. |
|---|---|

| Axis III | 1. | Hypertension. |
|---|---|---|
| | 2. | Hepatitis C. |
| | 3. | History of cerebral bleed in 2002. |
| | 4. | Obesity |
| | 5. | Hypothyroidism. |
| | 6. | Gastroesophageal reflux disease. |
| | 7. | Diabetes. |
| | 8. | Asthma. |

///

///

---

[8] GAF 47 is in the upper half of the range GAF 41-50, which indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM IV TR at 34.

1   Axis IV        Financial and social stressors, alcohol abuse.

2   Axis V         GAF = 65

3   AR 641-642.[9]

4   Plaintiff's family welcomed him home after his hospitalization.  They told the hospital

5   staff that Plaintiff would never hurt anyone.  Nonetheless, they agreed to stop purchasing

6   alcoholic beverages for Plaintiff.  On June 13, 2007, Howasepian noted that Plaintiff no longer

7   had homicidal ideation about his niece.

8   **Physical residual functional capacity assessment.** On May 26, 2006, agency employee

9   I. Ocrant prepared a physical residual functional capacity assessment for Plaintiff.  Ocrant opined

10  that Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand, walk, and

11  sit for six hours in an eight-hour workday; had unlimited ability to push and pull; could

12  occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; had unlimited

13  ability to reach and finger; had limited ability to handle or feel; and had no environmental

14  limitations except that he must avoid concentrated exposure to hazards.

15  **Vocational expert.** Vocational expert Kenneth Ferra testified that Plaintiff's prior jobs

16  as a hotel houseman and as an industrial cleaner would both be classified as light and unskilled

17  work "in the housekeeping line."  For the first hypothetical question, the ALJ directed Ferra to

18  assume an individual able to lift fifty pounds occasionally and twenty-five pounds frequently;

19  stand, walk, and sit a total of six hours in an eight-hour workday; never climb ladders, ropes, or

20  scaffolds; occasionally climb ramps or stairs; frequently balance, stoop, kneel, crouch, or crawl;

21  handle frequently with bilateral hands; cannot do work where fine touch is critical; and can

22  understand, remember, and carry out simple one- or two-step instructions.  Ferra opined that

23  Plaintiff could perform his prior work as a houseman or industrial cleaner, but could not work as

24  a security guard.

25

26          [9]   GAF 65 is in the middle of the range GAF 61-70, which indicates "Some mild symptoms (e.g., depressed

27  mood and mild insomnia) OR some difficulty in social, occupational, or school functioning e.g., occasional truancy,
or theft within the household), but generally functioning pretty well, has some meaningful interpersonal

28  relationships."  DSM IV TR at 34.

For the second hypothetical question, the ALJ directed Ferra to assume an individual of Plaintiff's age, education, and work experience whose ability to maintain persistence, concentration and pace are in the low average range and whose response time is slow.  In response to Ferra's request for clarification of what slow response time meant, the ALJ stated that, about one-third of the time, Plaintiff would not be able to figure out what he had to do, that is, "was just too overwhelmed to get it."  AR 1048.  Ferra opined that such a person could not perform Plaintiff's prior jobs.

For the last hypothetical question, the ALJ directed Ferra to assume that the hypothetical worker could not reliably maintain concentration, persistence or pace throughout an eight-hour work day.  Ferra agreed with the ALJ that such a person could not perform Plaintiff's prior work or any other work.

## II.   Discussion

### A.   Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

Step one:     Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

Step two:     Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.

Step three:     Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled. If not, proceed to step four.

Step four:      Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Step five:      Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

ALJ Larsen found that Plaintiff had not engaged in substantial gainful activity since the application date of August 2, 2005.  His severe impairments included status post cerebral hemorrhage; dysthymia; adjustment disorder, not otherwise specified; learning disability; diabetes; hypothyroidism; and diabetic neuropathy.   The ALJ concluded that none of Plaintiff's impairments met or equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Despite his impairments, Plaintiff remained able to perform his past work as a cleaner and houseman.

**B.     Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g., Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper

///

legal standards, and if the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

### C.   Physicians' Expert Opinions

Plaintiff contends that the ALJ improperly disregarded Nowlan's opinion and improperly evaluated Salcedo-Jackson's opinion.  As a result, the ALJ erred in determining Plaintiff's residual functional capacity.  The Commissioner disagrees.  Following its review of the record as a whole and applicable law, the Court concludes that the haphazard and incomplete discussion of the evidence as a whole and the ALJ's failure to fully articulate his reasoning resulted in a hearing decision that is inadequate for this Court's review. When an ALJ fails to make factual findings to support his decision or to explain its reasoning or both, a court has no basis on which it may review the decision.  *Pinto v. Massanari*, 249 F.3d 840, 844, 847 (9th Cir. 2001).

### 1.   Plaintiff's Credibility

Before analyzing the ALJ's analysis of the medical evidence, the Court notes that the ALJ's conclusion that Plaintiff lacked credibility was detailed and highly relevant to his evaluation of the medical record.  As set forth in both the hearing decision and this Court's account of the factual record, Plaintiff's reports of his symptoms and situation varied remarkably throughout the record.  Plaintiff's inconsistent reports of his alcohol use and his arrangement to have his son deny that Plaintiff was living in Nicol-Monroy's home with other family members are just two examples of Plaintiff's flexible attitude toward the truth.  As Howasepian succinctly observed, Plaintiff was not above prevarication.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991).  "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).

*See also Robbins v. Social Security Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."  *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms.  *Light v. Social Security Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).  The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities."  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision.  *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.*  Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to

///

17

seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

Medical treatment necessarily relies on the patient's account of his or her physical or mental condition, specific symptoms, effects of medications and other treatment, and such. Although Plaintiff certainly possesses multiple serious impairments, his medical records are replete with inconsistencies, patent exaggerations, and questionable representations that complicate a fact finder's attempts to identify the truth, especially within the limits of an administrative proceeding such as one evaluating a claimant's application for disability benefits. As the ALJ concluded, the opinions of Plaintiff's physicians must be evaluated in light of Plaintiff's limited credibility.

Nonetheless, Plaintiff's impaired credibility alone is insufficient to resolve the question of Plaintiff's residual functional capacity and ultimately, disability. The hearing decision must address all evidence of Plaintiff's medical condition and the ALJ's reasoning as carefully and completely as it addressed Plaintiff's credibility.

## 2. **Evaluation of Doctor's Opinions**

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work. *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p. The regulations provide that medical opinions are evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion. 28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

(nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than the opinion of a doctor who examined but did not treat the claimant, and an examining physician's opinion is generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security Administration favors the opinion of a treating physician over that of nontreating physicians.  20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating physician's opinion is not conclusive as to either a physical condition or the ultimate issue of disability.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

Once a court has considered the source of a medical opinion, it considers whether the Commissioner properly rejected a medical opinion by assessing whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the treating physician's opinion is generally given greater weight, when it is contradicted by an examining physician's opinion that is supported by different clinical findings the ALJ may resolve the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a detailed and thorough factual summary, address conflicting clinical evidence, interpret the evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  Without specific and legitimate reasons to reject the opinion, the ALJ must defer to the treating or examining professional.  *Lester*, 81 F.3d at 830-31.  The ALJ need not give weight to a conclusory opinion supported by minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881 F.2d at 751.

Although an ALJ is not bound by opinions rendered by a plaintiff's physicians regarding the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).  A general statement that objective factors or the record as a whole are insufficient: the

///

1  ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or

2  she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

3         **3.     Plaintiff's Physical Limitations**

4         Plaintiff contends that the ALJ erred in making "***no*** mention of Dr. Nowlan's opinion at

5  all," despite the fact that Nowlan's opinion conflicts with the ALJ's findings.  As a result,

6  contends Plaintiff, the ALJ's failure to address Nowlan's opinion constitutes clear error,

7  mandating reversal under SSR 96-8p.  The Commissioner counters that Nowlan's opinion was

8  articulated as an essential part of Ocrant's residual functional capacity analysis and that, in any

9  event, substantial evidence supported the ALJ's determination.

10        None of Plaintiff's treating physicians prepared a formal or detailed analysis of Plaintiff's

11 remaining capacity to do work.  Thus, Kator's opinions were gleaned from the voluminous

12 medical records included within the agency record.  Both Plaintiff and the ALJ excised a single

13 example from Kator's treatment notes to support their respective positions.  Neither example is

14 particularly helpful or relevant in determining Plaintiff's residual functional capacity for purposes

15 of this proceeding.

16        Both examples are drawn from Plaintiff's request for a certification that he was

17 permanently disabled, which he needed to regain his California driver's license, revoked as a

18 result of Plaintiff's failure to pay child support.  The ALJ relied on Kator's May 27, 2005 note:

19        I received a form through release of information today, requesting my certification
       that the patient is permanently and totally disabled. As far as I am aware, he is not
20     totally disabled by any medical problem.  I spoke with Dr. Howasepian, who will
       review the case.  I forwarded the form to him.
21     AR 362.

22        On June 14, 2005, Howasepian noted that he had attempted to contact Plaintiff by phone

23 to secure necessary information but that the person who answered the phone stated that Plaintiff

24 no longer lived there.  Kator completed the form on August 1, 2005.  Plaintiff relies on the copy

25 of the form (at AR 940), on which Kator indicated that Plaintiff was totally and permanently

26 disabled.

27        That Kator ultimately completed the form renders unconvincing the initial, equivocal

28 opinion on which the ALJ relied.  On the other hand, his execution of the form expresses the type

20

1  of conclusory opinion that is usually rejected in disability benefits analysis.  An ALJ is "not

2  bound by an expert medical opinion on the ultimate question of disability."  *Tomasetti v. Astrue*,

3  533 F.3d 1035, 1041 (9th Cir. 2008); Social Security Ruling 96-5p.  "Although a treating

4  physician's opinion is generally afforded the greatest weight in disability cases, it is not binding

5  on an ALJ with respect to the existence of an impairment or the ultimate determination of

6  disability."  *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

7       Nor is this Court persuaded by Plaintiff's argument that his physicians' issuing him of a

8  wheeled walker is somehow dispositive of this issue.  Whether such continued use was necessary

9  or not, Plaintiff had been using a walker since he experienced his brain hemorrhage.  That CCHC

10  provided a walker after Plaintiff had used another one for several years is hardly strong evidence

11  of disability when considered in the context of the record as a whole.  More importantly, Nowlan,

12  on whose opinion Plaintiff otherwise relies, opined that Plaintiff did not need any assistive

13  device to walk.

14       Plaintiff bore the initial burden of establishing his inability to perform his prior work.

15  *Pinto*, 249 F.3d at 844.  He did not bear his burden well.  Nonetheless, the ALJ's reliance on a

16  single, out-of-context note by a treating physician who did not otherwise opine on Plaintiff's

17  residual functional capacity and his completely ignoring the opinion of the agency's consulting

18  physician do not carry the day either.  Because Nowlan was the sole examining physician who

19  offered an opinion on Plaintiff's residual functional capacity, the ALJ erred in not acknowledging

20  his opinion and setting forth is reasoning in rejecting it.

21       As the Commissioner points out, the ALJ acknowledged that Plaintiff was examined by

22  Nowlan, who was the agency's consultative examiner in his analysis of Plaintiff's severe

23  impairments.  AR 14.  In examining Plaintiff, Nowlan noted that, despite Plaintiff's claims of

24  shoulder pain, Plaintiff's movement of his shoulder was not limited in any way.  Addressing

25  Nowlan's findings in the context of identifying Plaintiff's severe impairments does not magically

26  excuse the ALJ's totally ignoring Nowlan's opinion of Plaintiff's residual functional capacity.

27       The ALJ began his residual functional capacity analysis with a single sentence: "These

28  physical and mental limitations are consistent with the opinions of the state-agency medical

consultants who reviewed the record (Exhibits 11F, pp. 2-4; 5F, p. 3; 8F, p. 3)." AR 15.  The Commissioner treats the opinions of the agency staff physicians as having thereby been fully incorporated into the hearing decision.  If the ALJ intended this statement to adopt the reasoning articulated by the agency physicians, he does not say so.  In any event, in assessing a claimant's residual functional capacity, an ALJ must consider and evaluate the opinions of state agency physicians or psychologists using all factors set forth in the regulations for analyzing opinion evidence.  S.S.R. 96-6p.  The ALJ did not do so here.

Even if it were incorporated in full, the physical residual functional capacity assessment, completed by Dr. Ocrant, would not be sufficient to perform the ALJ's function in analyzing the opinions of Plaintiff's physical impairments.  Ocrant emphasized that diabetic neuropathy decreased sensation in both of Plaintiff's arms and that Plaintiff was morbidly obese.  Accordingly, Ocrant agreed with Nowlan's assessment that jobs requiring fine touch were unsuitable.  But Ocrant rejected Nowlan's lower estimate of the weight Plaintiff was capable of lifting and carrying, simply noting the range of motion in Plaintiff's shoulder was within normal limits and his pain prescription was "trivial."

As previously stated, the ALJ may reject the uncontradicted opinion of a treating or examining medical physician only for clear and convincing reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831. The ALJ erred here by failing to do so.  This omission must be addressed on remand.

### 3.   Intellectual and Emotional Limitations

Plaintiff next contends that the ALJ erred in claiming that Salcedo-Jackson's opinion that Plaintiff was capable of performing simple repetitive tasks Plaintiff supported the ALJ's conclusion that Plaintiff was capable of positions with simple one- or two-step instructions.  In support of his contention, Plaintiff cites Salcedo-Jackson's speculation that certain of Plaintiff's test scores could indicate that the hemorrhage damaged certain parts of Plaintiff's brain.

Neither treating physician (Howasepian and Battista) prepared an opinion on Plaintiff's mental residual functional capacity.  Salcedo-Jackson was the sole examining psychologist regarding Plaintiff's intellectual and emotional limitations.

1  Because Plaintiff's selections from Salcedo-Jackson's evaluation are taken out of context,

2  they are not persuasive.  Salcedo-Jackson opined that disparities in Plaintiff's test scores could

3  have arisen for various reasons, including damage from the interventricular hemorrhage,

4  emotional or psychiatric disorders, or normal aging.  She noted that, since she had no test results

5  predating Plaintiff's hemorrhage, she could not opine that the hemorrhage caused the disparities

6  or otherwise diminished Plaintiff's intellectual capabilities.

7  Plaintiff having told Salcedo-Jackson that he did not use alcohol, she did not contemplate

8  that Plaintiff's drinking habits may have contributed to discrepancies in his scores.  In his

9  consulting report, Battista attributed the unreliability of Plaintiff's test scores solely to his alcohol

10  abuse and dependence.  Plaintiff does not comment on the ALJ's omission of specific discussion

11  of Battista's opinion nor of the ALJ's failure to discuss the interaction between Plaintiff's alcohol

12  abuse and his mental and physical functioning.

13  In any event, Plaintiff's remaining work capability, not its precise etiology, is the relevant

14  factor.  As the Commissioner points out, Salcedo-Jackson considered Plaintiff capable of work

15  although his understanding, memory and performance would reflect his intellectual abilities.  He

16  had low-average attention, concentration, and pace, and might demonstrate slower response

17  times, initiative, and follow through.  Plaintiff would do better if instructions were presented

18  visually.  He could be expected to be pleasant, cooperative and make good effort on the job.

19  As was the case with his analysis of Plaintiff's physical abilities, the ALJ stated without

20  further comment that his decision was consistent with the mental residual functional capacity

21  prepared by the agency's staff physicians, Aquino-Caro and Murillo.  He did, however, discuss

22  Salcedo-Jackson's opinion.  On remand, the ALJ must more fully address all three opinions in

23  the context of Plaintiff's treatment records, including comment on Battista's examination and

24  report to Howasepian, and the disparate opinions regarding the role of Plaintiff's alcohol abuse

25  and dependence on his physical and mental impairments.

26        **D.        Step Four: Plaintiff's Ability to Perform Prior Work**

27  Plaintiff contends that the ALJ erred in concluding that he could perform his prior work

28  as a houseman since the DOT description of a "housekeeping" specifies a reasoning level of

three, which exceeds the simple one- and two-step instructions that Plaintiff is capable of

following.  The Commissioner responds that Plaintiff is capable of performing both of his

previous jobs in the manner that Plaintiff described his job duties.  Even if Plaintiff were unable

to perform his prior job as a hotel houseman, the Commissioner adds, he is still capable of

performing his prior work as an industrial cleaner, which has a reasoning level of 2.  Once again,

because the hearing decision fails to set forth adequate fact finding and the ALJ's reasoning, the

Court is unable to review the hearing decision and must remand for further proceedings.

After finding that Plaintiff's prior work as a janitor, hotel houseman, and security guard

qualified as past relevant work, the ALJ's step-four analysis was brief:

> Kenneth P. Ferra, the vocational expert, testified that security work is light work
> and semi-skilled.  Cleaner/sanitation worker and housekeeper are light and
> unskilled.  Mr. Ferra further testified Mr. Rowland, given his residual functional
> capacity, can perform his past jobs as a cleaner/sanitation worker, and as a
> houseman/housekeeper as he performed them and as they are generally performed.

AR 19.

At step four, the claimant bears the burden of proving that he or she cannot perform past

relevant work.  *Matthews*, 10 F.3d at 681.  The claimant may not simply assume that he cannot

return to his former employment.  *Pitchard v. Schweiker*, 692 F.2d 198, 201 (1st Cir. 1982).  "A

claimant establishes a prima facie case of disability by showing that his impairments prevent him

from doing his previous job."  *DeLorme v. Sullivan*, 924 F.2d 841, 849-50 (9th Cir. 1991).   If the

claimant fails to do so, the burden never shifts to the Commissioner, and no vocational expert

testimony is necessary.  *Matthews*, 10 F.3d at 681.

Although the claimant bears the burden of proof at step four, the ALJ is still required to

make the requisite factual findings to support his or her conclusion.  *Pinto*, 249 F.3d at 844.  He

or she must compare a claimant's residual functional capacity to the physical and mental

demands of the claimant's past work.  20 C.F.R. § 416.920(f); *Pinto*, 249 F.3d at 844-45.  If the

claimant can still perform his or her prior work, he or she is not disabled.  *Id.*

"To determine whether a claimant has the residual functional capacity to perform his past

relevant work, the [ALJ] must ascertain the demands of the claimant's former work and then

compare the demands with his present capacity."  *Villa v. Heckler*, 797 F.2d 794, 797-98 (9th Cir.

1986).  *See also Marcia v. Heckler*, 900 F.2d 172, 177 n. 6 (9th Cir. 1990); *Valencia v. Heckler*, 751 F.2d 1082, 1086-87 (9th Cir. 1985); *Banks v. Barnhart*, 434 F.Supp.2d 800, 806 (C.D. Cal. 2006).  The ALJ is required to make factual findings regarding the claimant's residual functional capacity, the past physical and mental demands of his or her past relevant work, and the relation of the residual functional capacity to the past work.  *Pinto*, 249 F.3d at 844-45.  A claimant will be found "not disabled" if he retains "1.  The actual functional demands and job duties of a particular past relevant job; or (2) The functional demands and job duties of the occupation as generally required by employers throughout the national economy."  *Id.* at 845, *quoting* S.S.R. 82-61.  Two sources may be used to define a claimant's past relevant work as actually performed: a properly completed vocational report or the claimant's own testimony.  *Id.*

In *Garnica v. Astrue*, 238 Fed.Appx. 254, 255 (9th Cir. 2007), the Ninth Circuit considered a hearing decision with a step four analysis much like the one in this case:

> After briefly recounting Garnica's testimony and the testimony of a vocational expert, the ALJ stated: "I find the claimant retains the residual functional capacity for a limited range of light work.  Therefore, consistent with the vocational expert's testimony, she can perform her past relevant work.

The Ninth Circuit explained that S.S.R. 82-62 required deeper analysis: "[T]he ALJ did not discuss any of the *specific* mental and physical demands intrinsic to [the claimant's] three prior jobs . . . nor did he explain how her retained functional capacity satisfied those specific demands."  *Garnica*, 238 Fed. Appx. at 255.  Before concluding that a claimant can still perform his or her prior work, ALJ's are required to consider in detail the interaction of the limiting effects of the claimant's severe impairments and the physical and mental demands of each prior position.  *Id.*  Performing that analysis requires the ALJ to have made all requisite factual findings to support the analysis and its conclusion.  *Id.*  The same deficiencies are apparent in the hearing decision in this case.

The regulations permit an ALJ to define a claimant's past relevant work either through the claimant's actual past functions or through his past occupation's functions as generally required within the national economy.  20 C.F.R. § 416.960(b)(2); *Nolan v. Commissioner of Social Security Admin.*, 154 Fed.Appx. 640, 641 (9th Cir. 2005).  To determine a claimant's

1   ability to perform past work, the Commissioner requests information from the claimant about the

2   work he or she has done in the past.  20 C.F.R. § 416.960(b)(2).  The Commissioner may then

3   use the services of a vocational expert to determine whether the claimant can do his or her past

4   relevant work in light of his or her residual functional capacity.  *Id.*  Here, the ALJ stated,

5   without any supporting discussion, that Plaintiff could perform his prior positions both "as he

6   performed them and as they are generally performed."  AR 19.

7        The best source for how a job is generally performed is usually the Dictionary of

8   Occupational Titles.  *Pinto*, 249 F.3d at 845.  The ALJ may not accept vocational testimony that

9   contradicts the Dictionary of Occupational Titles unless the record contains "persuasive evidence

10  to support the deviation."  *Id.* at 847.  In addition, S.S.R. 00-4p explicitly requires the ALJ to

11  determine whether the expert's testimony differs from the Dictionary of Occupational Titles and

12  whether there is a reason for the deviation.  *Massachi v. Astrue*, 486 F.3d 1149, 1153 (9th Cir.

13  2007).

14       Relying on a generic occupational classification of the work "is likely to be fallacious and

15  unsupportable."  S.S.R. 82-61.  *See also Vertigan v. Halter*, 260 F.3d 1044, 1051 (9th Cir. 2001)

16  ("[B]road generic occupational classifications . . . are insufficient to test whether a claimant can

17  perform past relevant work.").  In the rare case in which an ALJ must use such a generic

18  classification, he or she must make the requisite factual findings to support his conclusion.

19  *Carmickle v. Commissioner, Social Security Admin.*, 533 F.3d 1155, 1167 (9th Cir. 2008).  In

20  addition, the ALJ errs if he or she classifies an occupation according to its least demanding

21  variation. *Carmickle*, 533 F.3d at 1166.

22       Finally, the ALJ must discuss the past physical and mental demands and the relation of

23  the residual functional capacity to each prior job.  *McGuffey v. Astrue*, 247 Fed.Appx. 903, 905

24  (9th Cir. 2007).

25       The rationale for a disability decision must be written so that a clear picture of the
         case can be obtained.  The rationale must follow an orderly pattern and show how

26       specific evidence leads to a conclusion.

27       S.S.R. 82-62.

28  ///

As with its analysis of Plaintiff's residual functional capacity, the hearing decision's step four analysis is so perfunctory as to prevent this Court's review.  On remand, the Commissioner must ensure that the step four analysis meets the requirements of S.S.R. 82-62 and the cases examining it.

**III.   Conclusion and Order**

Because the hearing decision fails to fully articulate the evidence presented in this matter and the ALJ's reasoning in determining that Plaintiff was not disabled, the decision in this matter is vacated and the case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.   The Clerk of Court is directed to enter judgment for Plaintiff and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   October 3, 2011**                          **/s/ Sandra M. Snyder**
                                                      UNITED STATES MAGISTRATE JUDGE